# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMERICAN FEDERATION OF MUSICIANS AND EMPLOYERS' PENSION FUND<br><br>and<br><br>BOARD OF TRUSTEES OF THE AMERICAN FEDERATION OF MUSICIANS AND EMPLOYERS' PENSION FUND<br>14 Penn Plaza, Twelfth Floor<br>New York, New York 10122<br><br>               Plaintiffs,<br><br>               v.<br><br>ATLANTIC RECORDING CORPORATION<br>3400 W. Olive Ave.<br>Burbank, CA 91505,<br><br>SONY MUSIC ENTERTAINMENT<br>550 Madison Ave.<br>New York, NY 10022,<br><br>UMG RECORDINGS, INC.<br>6301 Owensmouth Ave.<br>Woodland Hills, CA 91367,<br><br>and<br><br>WARNER BROTHERS RECORDS, INC.,<br>3400 W. Olive Ave.<br>Burbank, CA 91505<br><br>               Defendants. | Civil Action No. 15-6267 (GHW) |

## **FIRST AMENDED COMPLAINT**

1

Introduction

1.      This is an action to collect delinquent contributions that the Defendants owe to the Plaintiff American Federation of Musicians and Employers' Pension Fund ("Pension Fund" or "Fund") under the terms of a collectively bargained agreement between the Defendants and the American Federation of Musicians of the United States and Canada, AFL-CIO ("AFM"), and for a declaratory judgment with respect to the Defendants' contribution obligations to the Fund. This action is brought pursuant to § 502(a)(3) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(3), to enforce § 515 of ERISA, 29 U.S.C. § 1145; pursuant to § 301(a) of the Labor Management Relations Act of 1947 ("LMRA"), 29 U.S.C. § 185(a), to obtain relief for breach of a collective bargaining agreement; and pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, to obtain the remedy created by that Act.

Jurisdiction and Venue

2.      The Court has jurisdiction of this action under 29 U.S.C. § 1132(a)(3), 29 U.S.C. § 185(a), and 28 U.S.C. § 1331.

3.      Venue is proper in this district pursuant to 29 U.S.C. § 1132(e)(2) because the Pension Fund is administered in this district, and under 29 U.S.C. § 185(a) because the Court has jurisdiction over all parties.

Parties

4.      Plaintiff Pension Fund is a trust fund established and maintained pursuant to § 302(c)(5) of the LMRA, 29 U.S.C. § 186(c)(5).  Plaintiff Pension Fund is an employee benefit plan within the meaning of §§ 3(2) and 3(3) of ERISA, 29 U.S.C. §§ 1002(2) and (3), and is maintained for the purpose of providing retirement and related benefits to eligible participants

2

and their beneficiaries. Plaintiff Pension Fund also is a multiemployer pension plan within the meaning of § 3(37) of ERISA, 29 U.S.C. § 1002(37).

5. Plaintiff members of the Board of Trustees of the Pension Fund (hereinafter, "Trustees") are fiduciaries within the meaning of § 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A).

6. All Plaintiffs maintain their principal place of business at 14 Penn Plaza, Twelfth Floor, New York, New York 10122, from where the Pension Fund is administered.

7. Plaintiffs bring this action on behalf of themselves and on behalf of Pension Fund participants and beneficiaries pursuant to §§ 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), to enforce § 515 of ERISA, 29 U.S.C. § 1145; pursuant to § 301(a) of the LMRA, 29 U.S.C. § 185(a), to obtain relief for breach of a collective bargaining agreement; and pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, to obtain the remedy created by that Act.

8. Each Defendant — Atlantic Recording Corporation ("Atlantic"), Sony Music Entertainment ("Sony"), UMG Recordings, Inc. ("UMG"), and Warner Brothers Records, Inc. ("Warner") — is an employer in an industry affecting commerce within the meaning of Sections 3(5), 3(11), and 3(12) of ERISA, 29 U.S.C. §§ 1002(5), (11) and (12), and Sections 2(2), (6) and (7) of the LMRA, 29 U.S.C. §§ 152(2), (6) and (7).

9. Each Defendant is an incorporated entity doing business under its own name and through subsidiaries and affiliates throughout the United States and abroad, including within this judicial district.

3

**Statement of Claims**

Background Facts

10.     For many years, including at all relevant times herein, the major record companies in this country, including each Defendant, and the AFM—a labor union that represents musicians who are employed in the recording of phonographic records—have been parties to a series of collectively bargained agreements styled as "Sound Recording Labor Agreements," or "SRLAs" for short.

11.     The SRLAs require, *inter alia*, that the signatory record companies share with musicians represented by the AFM some designated portion of certain revenues earned from various exploitations of sound recordings made by those musicians, including the direct sale of such sound recordings by the record companies and the record companies' licensing to third parties of their rights in such sound recordings.

12.     From the inception of the SRLA to the early 2000s, the primary form of exploitation of sound recordings was via physical product sales (*e.g.*, vinyl records, cassette tapes, compact discs), and the formulas and distribution mechanisms within the SRLA at such times detailed the record companies' obligations to share revenues with musicians specifically with respect to physical products.

13.     The advent of the digital age, however, gradually led to the creation of new digital forms of exploitation of sound recordings, including permanent audio downloads (*e.g.*, iTunes) and non-permanent audio downloads and audio streams (*e.g.*, Rhapsody and other subscription services).  This development required AFM to negotiate new agreements with the record companies to ensure that its member-musicians shared in a portion of the revenues the record companies earned from the digital exploitation of sound recordings.

14. Even though the full potential of such digital exploitations was yet to be realized at the time and neither AFM nor the major record companies had a firm understanding of what such digital technologies would entail, the AFM and the companies reached an agreement in 1994 regarding the companies' obligation to share with AFM-represented musicians revenues from certain digital exploitations, commonly referred to as the 1994 Memorandum of Agreement, or "1994 MOA" for short. (A true and correct copy of the 1994 MOA is appended to this Complaint as Exhibit A and incorporated by reference herein.) The American Federation of Television and Radio Artists ("AFTRA"), a labor union representing vocalists who performed on the record companies' sound recordings, also was a party to the 1994 MOA. (AFTRA merged with the Screen Actors Guild in 2012 and is now known as SAG-AFTRA.) In the 1994 MOA, the parties pledged their joint best efforts to support legislation amending the Copyright Act of 1976 ("Copyright Act") in certain specific respects mutually desired by the parties. The parties' joint efforts in support of that legislation were successful, and the Copyright Act was in fact amended in 1995 in the manner mutually desired by the parties.

15. Under the 1995 amendments of the Copyright Act, the record companies (which typically own the copyrights in sound recordings produced under the SRLA) have the exclusive right to perform, or to authorize third parties to perform, those sound recordings by means of a digital transmission, limited by a statutory license (sometimes referred to as a "compulsory" license) for certain types of digital performances. The statutory or compulsory license permits third parties to publicly perform sound recordings by digital transmission upon meeting the statutorily prescribed license conditions and paying the licensing fees set in accordance with a statutorily prescribed process, with those licensing fees to be divided between the sound

recording copyright owners and performers (including musicians and vocalists) on a statutorily prescribed percentage basis.

16. For digital transmissions that are not subject to the statutory or compulsory license, the 1995 amendments provide that a record company that owns the sound recording copyright has the exclusive right to permit or deny third parties the right to publicly perform the sound recording, and a third party desiring to use a sound recording in this way must therefore negotiate a non-statutory or "voluntary" license with the record company. In anticipation of the 1995 amendments of the Copyright Act, the parties to the 1994 MOA explicitly agreed that the signatory record companies would pay (for further distribution to musicians represented by AFM) 0.5% of all receipts (as defined in the Act's legislative history) collected by the record companies "as a result of the amendment of the Copyright Act of 1976 to provide copyright owners with the exclusive right, not limited by statutory or compulsory licensing, to publicly perform sound recordings by means of a digital transmission." In the 1994 MOA, the record companies also agreed to make payments on the same basis for distribution to vocalists represented by AFTRA.

17. The record companies' contractual obligation under the 1994 MOA to share with musicians 0.5% of all receipts collected by them "as a result of" the above-described 1995 amendment of the Copyright Act encompassed an obligation to share with musicians 0.5% of all licensing revenues generated by the record companies pursuant to non-statutory or voluntary licenses authorizing third parties to engage in the digital transmission of the companies' copyrighted sound recordings in the United States, abroad, or both. That is so because the 1995 amendment conferred on the record companies, for the first time, an exclusive legal right to engage in the digital transmission of their copyrighted sound recordings that the companies could

then license for remuneration to third parties interested in engaging in such digital transmission in the United States, abroad, or both.

18. Although the copyright laws of the United States have been held to be without extraterritorial effect, and thus unenforceable against copyright infringements occurring abroad, there are at least two reasons why streaming services would be willing to enter into non-statutory or voluntary licenses with the record companies requiring the streaming services to pay the record companies an agreed-upon licensing fee for the right to engage in digital transmissions of the record companies' copyrighted sound recordings abroad. One reason is that if the streaming services were interested in contracting with the record companies for the right to engage in digital transmissions of the record companies' copyrighted sound recordings both in the United States and abroad, the record companies could and likely would refuse to enter into such a contractual arrangement with the streaming services absent an agreement by those streaming services to pay the record companies an agreed-upon licensing fee covering both domestic and foreign digital transmissions. A second reason is that under the WIPO Performances and Phonograms Treaty ("WPPT") to which the United States and most developed foreign countries are party, streaming services that engaged in digital transmissions of the record companies' copyrighted sound recordings in foreign countries signatory to the WPPT without the record companies' consent and without paying the record companies an agreed-upon licensing fee could be sued and held liable for copyright infringement in the courts or other designated tribunals of those foreign countries. Indeed, independent grounds for concluding that the revenues received by the record companies pursuant to non-statutory or voluntary licenses authorizing streaming services to engage in foreign digital transmissions of the record companies' copyrighted sound recordings in exchange for an agreed-upon licensing

fee are "as a result" of the 1995 amendments to the Copyright Act are that, but for those 1995 amendments, the record companies would not have attained either the economic leverage or the WPPT legal protections needed by them to generate such revenues.

19. The 1994 MOA expressly provided, in paragraph 4 thereof, that the above-described payment obligations imposed on the record companies by that agreement would "remain in full force and effect" for a period of 10 years, beginning on the February 1, 1996 effective date of the 1995 amendments of the Copyright Act and expiring on February 1, 2006.

20. In late 2005, shortly before the payment obligations imposed on the record companies by the 1994 MOA were set to expire, the AFM and the Defendant record companies entered into collective bargaining negotiations over a successor SRLA covering the period from February 1, 2006 to January 31, 2009. In January 2006, the record companies proposed for incorporation into the SRLA a "Digital Exploitation Agreement" ("January 2006 Record Company Proposal") to, among other things, replace the payment obligations imposed on the record companies by the 1994 MOA. (A true and correct copy of the January 2006 Record Company Proposal is appended to this Complaint as Exhibit B and incorporated by reference herein.)

21. In their January 2006 Record Company Proposal, the Defendant record companies denominated digital transmissions for which payments for the benefit of musicians had been required under the 1994 MOA as "Audio Streams," which they defined as "digital transmissions of Sound Recordings in the U.S. *and abroad*, in a manner that is not intended to provide a tangible copy of the exploited work to the consumer" (emphasis added). That record company proposal evinced a clear understanding on the companies' part that their expiring contractual payment obligations under the 1994 MOA with respect to audio streams had

extended to both audio streaming in the United States (*i.e.*, domestic audio streams) and audio streaming abroad (*i.e.*, foreign audio streams), as set out in paragraphs 17-18 above.

22. The January 2006 Record Company Proposal also proposed to continue the 0.5% payment rate contained in the 1994 MOA with respect to audio streams, but proposed significant alterations to other payment terms (including the application of the payment rate to "Wholesale Price" rather than to "receipts" and a limitation of the payment obligation on each sound recording to a period of ten years from its release).

23. The January 2006 Record Company Proposal did not become the final agreement between the parties (in part because the AFM refused to agree to the proposed changes in the payment terms). Instead, the parties reached an agreement in late 2006 on the terms of a new SRLA (the "2006 SRLA") memorialized by a Memorandum of Understanding that included, as Appendix A, a "Digital Exploitation Term Sheet." (A true and correct copy of the Digital Exploitation Term Sheet is appended to this Complaint as Exhibit C and incorporated by reference herein.) Consistent with the January 2006 Record Company Proposal, the Digital Exploitation Term Sheet defined the term "Audio Stream" as "a phonograph record which is sold via digital transmission in the U.S. *and abroad* using streaming technology and leaving no residual copy on the receiving device." (Emphasis added). And, the Digital Exploitation Term Sheet further provided that the record companies would make payments on Audio Streams, *as so defined*, that were made pursuant to non-statutory or voluntary licenses granted by the companies on the same payment terms set out in the 1994 MOA (including the payment rate of 0.5%, the application of the rate to "receipts," and no ten-year time limitation from the date of release of a recording). Thus, under the plain language of the Digital Exploitation Term Sheet, whenever the record companies enter into a non-statutory or voluntary license authorizing a third party to

9

engage in the digital streaming of the companies' copyrighted sound recordings in a foreign country or countries in exchange for an agreed-upon licensing fee, the record companies are contractually obligated to make payments on the licensing revenues generated by that foreign streaming on the payment terms set out in the 1994 MOU.

24.     The foregoing conclusion that flows from the plain language of the Digital Exploitation Term Sheet is strongly reinforced by the terms of an agreement subsequently entered into by the Defendant record companies with AFTRA, the other labor union party to the 1994 MOU.  (A true and correct copy of this subsequent agreement between the record companies and AFTRA is appended to this Complaint as Exhibit D and incorporated by reference herein.)  This subsequent agreement between the record companies and AFTRA was identical in its treatment of audio streams to the Digital Exploitation Term Sheet between the record companies and the AFM, with one important exception:  whereas the Digital Exploitation Term Sheet had defined the term "Audio Stream" as "a phonograph record which is sold via digital transmission in the U.S. *and abroad* using streaming technology and leaving no residual copy on the receiving device," (emphasis added), the subsequent AFTRA agreement defined the term "Audio Stream" as "a Covered Sound Recording which is sold via digital transmission *in the United States only* using streaming technology and leaving no residual copy on the receiving device."  (Emphasis added).  In successfully negotiating this narrower definition of "Audio Stream" in their subsequent agreement with AFTRA, the record companies evinced a clear understanding that their payment obligations under their Digital Exploitation Term Sheet with the AFM included an obligation to make payments on foreign audio streaming, and a clear purpose to limit their payment obligation in AFTRA's case to domestic streaming only.

25. The fact that in 2006 the AFM negotiated an agreement with the Defendant record companies requiring the companies to make payments on both domestic and foreign audio streams, whereas AFTRA subsequently negotiated an agreement with the Defendant record companies requiring the companies to make payments on domestic audio streams only, is consistent with the different history and pattern of collective bargaining between the two unions and the companies. Historically, both unions have bargained with the record companies for contract provisions allowing their members to share in the financial benefits flowing to the companies from the exploitation of their copyrighted sound recordings, but the two unions have accomplished this goal in different ways. The SRLA between the AFM and the record companies has for many decades provided for a residual benefit fund called the Special Payments Fund, to which the companies are required to make contributions for the benefit of musicians based on the sales of physical product in both the United States and abroad. Since 2004, the SRLA also has required the companies to make contributions to the Special Payments Fund for the benefit of musicians based on the sale of permanent digital downloads in both the United States and abroad. Many years ago, AFTRA negotiated a different system with the record companies, under which the companies are required to make additional scale wage payments ("contingent scale" payments) to vocalists when sound recordings on which the vocalists perform exceed specified thresholds of physical product sales in the United States only. When AFTRA and the record companies later negotiated over permanent digital downloads, they reached an agreement requiring payments into a fund in lieu of contingent scale payments, but those payments were based on the sale of permanent digital downloads in the United States only.

26. The Digital Exploitation Term Sheet between the Defendant record companies and AFM also clarified a question that had arisen among the parties as to whether the sale of

11

non-permanent audio downloads of sound recordings should be subject to payment terms similar to those applicable under the SRLA to the sale of permanent audio downloads of sound recordings, or instead should be subject to the payment terms applicable under the 1994 MOA to the sale of audio streams.  The Digital Exploitation Term Sheet resolved that question by adopting neither model:  rather, it created a free-standing payment obligation on the part of the Defendant record companies with respect to the sale of non-permanent audio downloads, consisting of an obligation to pay 0.55% of the wholesale price on non-permanent audio downloads of sound recordings produced on or after February 1, 2006.  For this purpose, and in a manner fully consistent with the 1994 MOA's and the Digital Exploitation Term Sheet's treatment of audio streams, the contracting parties defined the term "Non-Permanent Download" to include a sound recording "sold via digital transmission in the U.S. *and abroad* on a temporary, tethered, conditional, or 'timed out' basis"  (emphasis added).

27.   The Digital Exploitation Term Sheet did not resolve a similar question as to whether the sale of "ringbacks" should be subject to payment terms similar to those applicable under the SRLA to the sale of permanent audio downloads, or instead should be subject to the payment terms applicable under the 1994 MOA to the sale of audio streams.  Rather, the Digital Exploitation Term Sheet provided that "Ringbacks shall be covered by, and payments shall be made pursuant to, either [the SRLA] or the 1994 MOA (as may be amended)."  (The parties subsequently agreed in an agreement referred to herein as the 2012 Payment Obligation Agreement that the sale of ringbacks would be subject to the payment terms of the 1994 MOA.)  Although the Digital Exploitation Term Sheet does not define the term "ringbacks," nothing in that agreement or its negotiating history suggests that the contracting parties intended that -- in contrast to payments on the sale of audio streams and non-permanent audio downloads --

payments on the sale of ringbacks would be limited to domestic sales only, and exclude foreign sales.

28. The foregoing contractual payment obligations imposed on the Defendant record companies by the Digital Exploitation Term Sheet of the 2006 SRLA have been continued in full force and effect without interruption from the expiration of the 2006 SRLA on January 31, 2009 through the present time pursuant to multiple extension agreements entered into by the parties to the SRLA.

29. In late 2012, the AFM and the Defendant record companies entered into a collectively bargained agreement (the "2012 Payment Obligation Agreement") providing that all contractually required record company payments on (a) audio streams, (b) non-permanent audio downloads and (c) ringbacks, then due and owing and thereafter due and owing in accordance with the parties' Digital Exploitation Term Sheet, would be made to the Plaintiff Pension Fund. (A true and correct copy of the 2012 Payment Obligation Agreement is appended to this Complaint as Exhibit E and incorporated by reference herein.) The 2012 Payment Obligation Agreement is thus a collectively bargained agreement under which the Defendant record companies are obligated to make contributions to the Pension Fund within the meaning of section 515 of ERISA, 29 U.S.C. § 1145. The 2012 Payment Obligation Agreement is also a contract between employers and a labor organization within the meaning of section 301 of the LMRA, 29 U.S.C. § 185.

30. Non-defendant Capitol Records, LLC was a party to both the Digital Exploitation Term Sheet and the 2012 Payment Obligation Agreement, but by virtue of Defendant UMG's purchase of Capitol Records, the contractual payment obligations of Capitol Records under those agreements are now the contractual payment obligations of Defendant UMG.

# COUNT I – BREACH OF CONTRACTUAL OBLIGATION TO MAKE PAYMENTS TO THE PENSION FUND ON REVENUES DERIVED FROM FOREIGN AUDIO STREAMS
**(Against All Defendants Under ERISA § 515 and LMRA § 301)**

31.  Plaintiffs reallege and restate each of the allegations set forth in Paragraphs 1–30.

32.  On or around January 30, 2014, the Pension Fund, through independent auditors, initiated an audit of each Defendant record company to determine if each company was in compliance with its contractual payment obligations to the Pension Fund under the 2012 Payment Obligation Agreement.

33.  Although these audits have not yet been completed, the audits to date and other information available to the Fund show that Defendants Atlantic, UMG and Warner are not currently reporting on and making contributions to the Fund on revenues derived from foreign audio streams, and, indeed, have made no such contributions to the Fund for any time period in which such contributions were due under the 2012 Payment Obligation Agreement. Although Defendant Sony, by contrast, has in the past reported on and made contributions to the Fund on revenues derived from foreign audio streams, Sony has stopped doing so and is not doing so currently. It appears that non-Defendant Hollywood Records, a party to both the SRLA and the 2012 Payment Obligation Agreement, has consistently made and is currently making contributions to the Fund on revenues derived from foreign audio streams.

34.  The Pension Fund has demanded that each Defendant record company report on and pay all contractually required contributions to the Fund on revenues derived from foreign audio streams. In response to that demand, each of the Defendant record companies has unequivocally denied having any contractual obligation to the Fund with respect to revenues derived from foreign audio streams.

14

35. The failure of each Defendant record company to report on and pay all contractually required contributions to the Pension Fund on revenues derived from foreign audio streams is a breach of its contractual payment obligations to the Fund under the 2012 Payment Obligation Agreement that is actionable and remediable under both § 515 of ERISA, 29 U.S.C. § 1145, and § 301 of the LMRA, 29 U.S.C. § 185.

**COUNT II – BREACH OF CONTRACTUAL OBLIGATION TO MAKE PAYMENTS TO THE PENSION FUND ON EARNINGS DERIVED FROM FOREIGN NON-PERMANENT AUDIO DOWNLOADS**
**(Against Defendants Atlantic & Warner Under ERISA § 515 and LMRA § 301)**

36. Plaintiffs reallege and restate each of the allegations set forth in Paragraphs 1–30.

37. In the communications between the Pension Fund and the Defendant record companies on the issue of foreign audio streams, the Defendant record companies have stated that, "[a]s a general matter," they "do not dispute" that payments on foreign non-permanent audio downloads "are required." However, the Fund's audits to date and other information available to the Fund show that Defendants Atlantic and Warner are not currently reporting on and making contributions to the Fund on earnings derived from foreign non-permanent audio downloads, and, indeed, have made no such contributions to the Fund for any time period in which such contributions were due under the 2012 Payment Obligation Agreement.

38. The failure of Defendants Atlantic and Warner to report on and pay all contractually required contributions to the Fund on earnings derived from foreign non-permanent audio downloads is a breach of those companies' contractual payment obligations to the Fund under the 2012 Payment Obligation Agreement that is actionable and remediable under both § 515 of ERISA, 29 U.S.C. § 1145, and § 301 of the LMRA, 29 U.S.C. § 185.

### COUNT III – BREACH OF CONTRACTUAL OBLIGATION TO MAKE PAYMENTS TO THE PENSION FUND ON ALL REVENUES DERIVED FROM RINGBACKS
### (Against All Defendants Under ERISA § 515 and LMRA § 301)

39. Plaintiffs reallege and restate each of the allegations set forth in Paragraphs 1–30.

40. The Pension Fund's audits to date and other information available to the Fund show that none of the Defendant record companies has reported on and paid to the Fund contractually required contributions based on all revenues, foreign and domestic, derived by the companies from the sale of ringbacks.

41. The Pension Fund has raised this issue with each Defendant record company and demanded that each company report on and pay all contractually required contributions to the Fund on revenues derived from the sale of ringbacks, both foreign and domestic. The Defendant companies, in response, have stated that, "[a]s a general matter," they "do not dispute" that payments on domestic sales of ringbacks "are required," but each of the companies has unequivocally denied having any contractual obligation to the Fund with respect to foreign sales of ringbacks.

42. The failure by each Defendant record company to report on and pay to the Fund contractually required contributions based on all revenues, foreign and domestic, derived by the company from the sale of ringbacks, is a breach of its contractual payment obligations to the Fund under the 2012 Payment Obligation Agreement that is actionable and remediable under both § 515 of ERISA, 29 U.S.C. § 1145, and § 301 of the LMRA, 29 U.S.C. § 185.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

a. Enter a judgment declaring that the Defendant record companies have a contractual obligation to make payments to the Plaintiff Pension Fund on all (a) revenues derived

by the record companies from foreign audio streams; (b) earnings derived by the record companies from foreign non-permanent audio downloads; and (c) revenues, foreign and domestic, derived by the record companies from ringbacks.

  b. Enter an injunction: (i) requiring that each of the Defendant record companies that has failed to do so promptly submit reports to the Pension Fund identifying by category the audio stream, non-permanent audio download and ringback revenues or earnings on which it has not previously made contributions to the Fund in accordance with its contractual obligations as declared by the Court, such identification to be made with sufficient detail and precision to enable the Fund to calculate the delinquent contribution amounts due and owing to the Fund from each Defendant record company based on those revenues or earnings; and (ii) requiring each of the Defendant record companies to provide the Funds' auditors with immediate, unrestricted access to the books and records necessary to allow the auditors to verify the accuracy of the company's reports.

  c. Enter a separate monetary judgment against each Defendant record company for the full amount of the delinquent contributions that the reports submitted by each company and verified by the Fund's auditors show are due and owing to the Fund, together with interest on those delinquent contributions and liquidated damages in an amount equal to 20% of each Defendant's delinquent contributions as provided for under the Trust Agreement and ERISA § 502(g)(2)(C)(ii), 29 U.S.C. § 1132(g)(2)(C)(ii).

  d. Award Plaintiffs their reasonable attorneys' fees and costs incurred in bringing and prosecuting this litigation.

  e. Order such other legal and equitable relief as the Court deems appropriate.

DATED:  October 16, 2015                              Respectfully submitted,

       /s/ Andrew Roth
Patricia McConnell
Meyer Suozzi English & Klein, P.C.
1350 Broadway
New York, NY 10036
(212) 239-4999
pmcconnell@msek.com

J. Penny Clark
Andrew Roth
Zachary Ista
Bredhoff & Kaiser, P.L.L.C.
805 15th St. NW, Suite 1000
Washington, D.C. 20005
(202) 842-2600
jpclark@bredhoff.com
aroth@bredhoff.com
zista@bredhoff.com

*Counsel for Plaintiffs*