# Exhibit B

**Record Industry's Comprehensive Audio Visual Proposal**

**January 2006**

The record industry offers the following Comprehensive Audio Visual Proposal designed to cover both physical sales and digital exploitations of AFM-covered phonograph records and audio visual productions in a simplified and unified manner.  The principal components of this proposal, which would be effective February 1, 2006, are set forth below.

1.      The creation of a Digital Exploitation Agreement to (i) replace the 2004 Digital Distribution Memorandum of Agreement and the 1994 MOA in their entirety with respect to downloading and streaming of sound recordings and (ii) create a payment obligation with respect to downloading and streaming of traditional music videos.

2.      The creation of an Audio Visual Agreement for Physical Product to replace the Video Promo Supplement.

**<u>Digital Exploitation Agreement</u>**

I. <u>Scope</u>

    A.    This Agreement is intended to cover the commercial, digital exploitation of (i) AFM-covered Sound Recordings (as defined herein) and (ii) Traditional Music Videos (as defined herein), whether such digital exploitations occur through Downloads, Non-Permanent Downloads or Streams (as such terms are defined herein, each a "Covered Exploitation"), occurring on or after February 1, 2006. For the avoidance of doubt, nothing herein shall be construed as covering the promotional, digital exploitation of any Sound Recordings or Traditional Music Videos.

    B.    <u>Definitions</u>

        1.    The term "Sound Recording" shall be defined as one (1) track or song (or a portion thereof) produced by a signatory record company pursuant to the Sound Recording Labor Agreement.

        2.    The term "Traditional Music Video" shall be defined as an audio visual product containing both a Sound Recording and a visual element of the type or genre traditionally aired on television for promotional purposes, e.g., MTV, VH1, BET, CMT, etc.

        3.    The term "Permanent Audio Downloads" shall be defined as Sound Recordings which are sold to the consumer via digital transmission in the U.S. and abroad in a manner which provides a permanent copy of the Sound Recording to the consumer. The term "Permanent Video Downloads" shall be defined as Traditional Music Videos which are sold to the consumer via digital transmission in the U.S. and abroad in a manner which provides a permanent copy of the Traditional Music Video to the consumer. ("Permanent Audio Downloads" and "Permanent Video Downloads" are collectively referred to herein as "Downloads"). For clarification purposes, "Downloads" shall include master ringtones.

        4.    The term "Non-Permanent Downloads" shall be defined as temporary, tethered, conditional or "timed out" sales of Sound Recordings or Traditional Music Videos, distributed to the consumer via digital transmission in the U.S. and abroad, typically through a subscription service model.

        5.    The term "Audio Streams" shall be defined as digital transmissions of Sound Recordings in the U.S. and abroad, in a manner that is not intended to provide a tangible copy of the exploited work to the consumer. The term "Video Streams" shall be defined as digital transmissions of Traditional Music Videos in the U.S. and abroad, in a manner that is not intended to provide a tangible copy of the exploited work to the consumer. ("Audio Streams" and "Video Streams" are collectively referred to herein as "Streams").

1

6.     The term "Wholesale Price" shall be defined as the wholesale price actually received from the digital service provider in consideration of the sale of a Download, Non-Permanent Download or Stream or, if no wholesale price is applicable to the Covered Exploitation, the monies actually received from the digital service provider and attributable to the exploitation of such Download, Non-Permanent Download or Stream.

## II.  Term

- ▪ February 1, 2006 through January 31, 2009.

## III.  Payment Terms

A.     Exclusions: Continue the 10,000 Permanent Audio Download unit exclusion and create a separate 10,000 Permanent Video Download unit exclusion.  There shall be no exclusions on Streams.

B.     Rate: Pay ½ of 1% of the Wholesale Price on each Covered Exploitation in excess of the applicable exclusions for the term of the Agreement.

C.     Ten Year Limitation: The payments provided for in this Agreement shall be made with respect to Covered Exploitations of any Sound Recording or Traditional Music Video, produced from or containing a master record, which take place during the period commencing with the calendar year during which the record in which the Sound Recording is embodied is first released for exploitation in any form and terminating at the end of the tenth calendar year thereafter.  The year of such release shall be counted as the first year of the ten years.  For purposes of calculating the ten year period for exploitations of Traditional Music Videos, the first year shall be the year in which the underlying Sound Recording embodied within the music video was released, regardless of when the music video was released.

## IV.  Recipient Fund

A.     For Downloads occurring on or after February 1, 2006, all required payments shall be made to the AFM Special Payments Fund ("SPF").

B.     For Non-Permanent Downloads and Streams occurring on or after February 1, 2006, all required payments shall be made to the AFM/AFTRA Intellectual Property Rights Distribution Fund (the "AFM/AFTRA Fund").

C.     There shall be no Music Performance Fund contributions on Covered Exploitations.

## V.  Compliance Issues

A.     For payments required to be made to the SPF hereunder, the compliance and audit provisions contained within 2004 Digital Distribution Memorandum of Agreement ("DDMOA") shall apply.

B.   For payments required to be made to the AFM/AFTRA Fund hereunder, compliance and audit terms similar to those contained in the DDMOA shall apply. In addition, subject to the execution of an appropriate confidentiality agreement, each Company will submit, at least twice annually, by digital transmission, information contained within periodic accounting reports sufficient to show, for each Stream during the applicable time period, (i) the identity of the artist, (ii) the applicable ISRC number (or other label-specific identification code) of the exploited Sound Recording, (iii) the title of the exploited Sound Recording, (iv) the number of times that Sound Recording was exploited and (v) the total amount of Receipts collected from that digital service provider.

VI. <u>No Liability for Prior Periods or Compulsory Licenses.</u>

A.   This Agreement is conditioned upon obtaining a full and unconditional release from the AFM, the SPF and the AFM/AFTRA Fund with respect to any Permanent Video Downloads or Video Streams occurring prior to February 1, 2006.

B.   This Agreement is further conditioned upon an express understanding that the payments required under this Agreement shall be the sole payments required to be made to musicians by signatory companies for Covered Exploitations (except as may be otherwise required under royalty agreements).

C.   Nothing in this Agreement shall cover transmissions that are subject to a compulsory statutory license.

**Audio Visual Agreement for Physical Product**

Effective February 1, 2006, the production and sales of Audio Visual Physical Product (as defined herein) shall be governed by the terms and conditions set forth below.  For purposes of this Agreement only, the term "Audio Visual Physical Product" shall be defined as audio visual productions, embodied within a physical format or configuration, which incorporates one or more "Sound Recordings" produced pursuant to the AFM Sound Code.  As used herein, the term "Sound Recording" shall be defined as one (1) track or song (or a portion thereof) produced by a signatory record company pursuant to the Sound Recording Labor Agreement ("SRLA").  The term "Audio Visual Physical Product" shall not include (i) audio visual product, embodied within a physical format or configuration, which is combined with or added to a "phonograph record" (as defined in the SRLA), primarily for the purpose of adding value to, or generating additional sales of, such phonograph records, e.g. hybrid discs, dual discs, enhanced compact discs and CD/DVD combination packages, (ii) long form videos or (iii) music video singles.

I.   Production

    A.    The Company will pay to each side musician, i.e. other than a "royalty artist", (as that term is defined in the SRLA) who performs as a musician "on-camera" (and for purposes of this Agreement, this shall include "sideline musicians" as that term is commonly understood) in any Audio Visual Physical Product produced on or after February 1, 2006, the sum of $246.63 per 10 hour day.  Pension and welfare payments at the rates and conditions set forth in the SRLA shall be made.  For work performed in excess of 10 hours, the musicians shall be compensated at 1½ times the pro rata 10 hour payment at one-half hour intervals.

    B.    A Meal Period shall be provided with the time of the meal period to be determined at the producer's discretion subject to applicable state law.

II.   Term

- February 1, 2006 through January 31, 2009.

III.   Payment Terms

    A.    <u>Rate</u>:  Pay ½ of 1% of Wholesale Price generated from sales of Audio Visual Physical Product.  For purposes of this Agreement, the term "Wholesale Price" shall be defined as the price actually received by the Company from the retailer or other intermediary, as the case may be, for the sale of the Audio Visual Physical Product.

    B.    <u>Ten Year Limitation</u>:  The payments provided for in this Agreement shall be made with respect to sales of Audio Visual Physical Product, produced from or containing a master record, which take place during the period commencing with the calendar year during which the record in which the Sound Recording is embodied is first released for exploitation in any form and terminating at the end of the tenth calendar year thereafter.  The first year shall be the year in which the underlying Sound

Recording embodied within the Audio Visual Physical Product was released, regardless of when the Audio Visual Physical Product was released.

IV.  <u>Recipient Fund</u>

- All payments required to be made under III. A. above shall be made to the AFM Special Payments Fund ("SPF").

V.  <u>Compliance Issues</u>

- For payments required to be made hereunder, compliance and audit terms similar to those contained in the 2004 Digital Distribution Memorandum of Agreement shall apply.

VI.  <u>Sole Agreement on Audio Visual Physical Product</u>

- This Agreement is conditioned upon an express understanding that the payments required under this Agreement shall be the sole payments required to be made to musicians by the Company for sales of audio visual productions embodied within a physical format or configuration, including, without limitation, Audio Visual Physical Product, occurring on or after February 1, 2006 (except as may be otherwise required under royalty agreements).

2