```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8/23/2016
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
                                                                :
AMERICAN FEDERATION OF MUSICIANS                                :
AND EMPLOYERS' PENSION FUND; and                                :
BOARD OF TRUSTEES OF THE AMERICAN                               :    1:15-cv-6267-GHW
FEDERATION OF MUSICIANS AND                                     :
EMPLOYERS' PENSION FUND,                                        :    MEMORANDUM OPINION
                                                                :         AND ORDER
                                            Plaintiffs,         :
                                                                :
                  -v -                                          :
                                                                :
ATLANTIC RECORDING CORPORATION, *et*                            :
*al.*,                                                          :
                                                                :
                                            Defendants.         :
                                                                :
------------------------------------------------------------- X

GREGORY H. WOODS, United States District Judge:

## I.      INTRODUCTION

     Plaintiffs, the American Federation of Musicians and Employers' Pension Fund (the "Pension Fund") and the Board of Trustees of the American Federation of Musicians and Employers' Pension Fund, filed this action against the defendant record companies, alleging that Defendants failed to pay required contributions for several sources of revenue generated by digital sound recordings. Only one of the sources of alleged delinquent contributions, specifically voluntary licensing fees for foreign audio streams, is relevant for purposes of the present motion.

     Plaintiffs allege that a term sheet attached to a 2006 Memorandum of Understanding (the "2006 MOU") imposed payment obligations for revenue derived from the commercial digital exploitation of foreign audio streams—notwithstanding clear contractual language stating that nothing in that very same term sheet shall be construed as covering the commercial digital exploitation of all audio streams, domestic or foreign. Because the Court may not add, ignore, or

distort the clear and unambiguous terms of the contract, as urged by Plaintiffs, and for the further reasons addressed below, Defendants' partial motion to dismiss is GRANTED.

## II.     BACKGROUND

The American Federation of Musicians of the United States and Canada, AFL-CIO ("AFM") is a labor union that represents musicians who are employed in the recording of phonographic records.  Am. Compl. ¶ 10, Dkt. No. 44.  AFM and the major record companies in the United States, including Defendants, have been parties to a series of "Sound Recording Labor Agreements" ("SRLAs").  *Id.*  An SRLA is a collectively bargained agreement that requires the signatory record companies to share with musicians represented by AFM a designated portion of certain revenues earned from the various commercial exploitations of sound recordings made by those musicians.  *Id.* ¶ 11.

Traditionally, the primary form of commercial exploitation contemplated by the SRLAs was the sale of sound recordings embodied in physical products—such as vinyl records, cassette tapes, and compact discs.  *Id.* ¶ 12.  As digital forms of sound recordings became possible, however, AFM began negotiating new agreements with the record companies to account for the potential new sources of revenue generated by the sound recordings.  *Id.* ¶ 13.  The new digital forms of commercial exploitation included audio downloads, such as iTunes, as well as non-permanent audio downloads and audio streams, such as Rhapsody and other subscription-based streaming services.  *Id.*

In 1994, AFM entered into a memorandum of understanding with the major record companies (the "1994 MOA"), which was a separate agreement from any SRLA.  *Id.* ¶ 14; 1994 MOA, Dkt. No. 44-1; *see also* July 26, 2016 Hearing Tr. at 6:12–14, Dkt. No.64 (acknowledging that the 1994 MOA was a "separate agreement" from the existing SRLA).  The American Federation of Television and Radio Artists ("AFTRA"), a separate labor union representing vocalists who

performed on sound recordings, was also a party to the 1994 MOA. Am. Compl. ¶ 14. The parties to the 1994 MOA agreed to use their best efforts to support legislation to amend the Copyright Act of 1976. Am. Compl. ¶¶ 14–15; 1994 MOA, Preamble. Specifically, they agreed to support legislation that would "create a digital performance right in sound recordings," impose mandatory statutory licensing fees for certain digital transmissions of sound recordings, and direct that the statutory licensing fees be allocated to copyright owners, musicians, and vocalists consistent with an agreed-upon formula. 1994 MOA, Preamble.

The 1994 MOA did not contemplate that all digital transmissions of sound recordings would be subject to statutory or compulsory licensing fees under the proposed legislation. Am. Compl. ¶ 16. Rather, certain digital transmissions would be subject to "voluntary" licenses to be negotiated between third parties desiring to use the sound recording and the record company. *Id.* The 1994 MOA provided that, in the event that the desired legislation was enacted, the record companies would allocate to AFM 0.5% of all receipts that were not subject to the statutory license and collected "as a result of the amendment of the Copyright Act of 1976 to provide copyright owners with the exclusive right . . . to publicly perform sound recordings by means of a digital transmission." 1994 MOA ¶¶ 2, 7; *see also* Am. Compl. ¶ 16–17.

The efforts to amend the Copyright Act were successful, and the Copyright Act was subsequently amended in 1995 as contemplated by the 1994 MOA. Am. Compl. ¶ 14. By its terms, the payment obligations imposed by the 1994 MOA began upon the effective date of the proposed legislation, February 1, 1996, and remained in effect for a period of ten years from that date, until February 1, 2006. *Id.* ¶ 19; 1994 MOA ¶ 4.

In 2006, AFM and the record companies entered into a memorandum of understanding, agreeing to extend the existing SRLA for a period of three years, from February 1, 2006 until January 31, 2009. Am. Compl. ¶ 23; 2006 MOU, Dkt. No. 61. The 2006 MOU also modified the

existing SRLA and its accompanying agreements "as set forth [in the 2006 MOU]," but provided that "[i]n all other respects the provisions of the [SRLA and its accompanying agreements] shall remain in full force and effect." 2006 MOU, Preamble ¶¶ 1–2.[1]  In relevant part, the 2006 MOU provides: "The parties agreed to specific terms regarding the digital exploitation of (1) phonograph records (as defined in Appendix A) through Downloads or Non-Permanent Downloads, and (2) Traditional Music Videos (as defined in Appendix A) through Downloads, Non-Permanent Downloads and Video Streams . . . .  These specific terms are set forth in Appendix A, and shall be incorporated into the appropriate sections of the SRLA . . . ." 2006 MOU ¶ 11(b).  Appendix A of the 2006 MOU is entitled the "Digital Exploitation Term Sheet" (and referred to herein as the "2006 MOU Term Sheet"), and is thus incorporated as part of the 2006 MOU.  Am. Compl. ¶ 23; 2006 MOU Term Sheet.

The 2006 MOU Term Sheet similarly provides that it "shall set for the specific terms agreed by the parties regarding the digital exploitation of (A) phonograph records (as defined herein) through Downloads or Non-Permanent Downloads and (B) Traditional Music Videos (as defined herein) through Downloads, Non-Permanent Downloads or Video Streams . . . ." 2006 MOU Term Sheet ¶ 1.  "Traditional Music Videos," "Downloads," "Non-Permanent Downloads," "Audio Streams," and "Video Streams" are each separately defined.  *Id.* ¶¶ 1(d–h).  An Audio Stream is defined as "a phonograph record which is sold via digital transmission in the U.S. and abroad using streaming technology and leaving no residual copy on the receiving device." *Id.* ¶ 1(g).

Unlike the digital exploitation of phonograph records through Downloads and Non-Permanent Downloads—which are expressly covered by the 2006 MOU Term Sheet—the 2006

---

[1] The agreements identified by the preamble of the 2006 MOU include "the existing [SRLA] and its accompanying Video Promo Supplement, the Digital Distribution Memorandum of Agreement, Sound Recording Special Payments Fund ('SPF'), and Sound Recording Trust Agreement."  2006 MOU, Preamble ¶ 1.

4

MOU Term Sheet states that "[f]or the avoidance of doubt, nothing herein shall be construed as covering (C) the commercial digital exploitation of Audio Streams . . . or (E) transmissions that are subject to the compulsory statutory license established by 17 U.S.C. Section 114." *Id.* ¶ 1.  Rather, the 2006 MOU Term Sheet provides that:  (1) "Audio Streams that are subject to the compulsory license created by 17 U.S.C. Section 114 will be governed by the provisions of Section 114[;]" and (2) "Audio Streams that are made pursuant to interactive or other non-statutory licenses granted by the [signatory record companies] pursuant to Section 114, are covered by the 1994 MOA." *Id.* ¶ 1(k).

Plaintiffs allege that the record companies' payment obligations described in the 2006 MOU have continued without interruption, through the present, through multiple extensions agreed upon by AFM and the record companies.  Am. Compl. ¶ 28.  In 2012, the parties to the 1994 MOA agreed to modify that contract, agreeing that "receipts allocable to the AFM pursuant to Paragraph 2 [of the 1994 MOA] shall be paid to the [Pension Fund]."  2012 Agreement to Modify the 1994 MOA ("2012 Agreement") ¶ 1, Dkt. No. 44-5.

Plaintiffs filed suit on August 10, 2015, bringing claims under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1132(a)(3), 1145, and the Labor Management Relations Act of 1947 ("LMRA"), 29 U.S.C. § 185 for delinquent contributions owed to Plaintiffs under the 2012 Agreement.  Plaintiffs subsequently filed an amended complaint, Dkt. No. 44, alleging that Defendants failed to pay required contributions for revenue generated by three types of digital exploitations of sound recordings:  (1) foreign audio streams; (2) foreign non-permanent audio downloads; and (3) ringbacks.  Defendants thereafter filed a partial motion to dismiss the amended complaint, seeking to dismiss Plaintiffs' claims with respect to foreign audio streams.  Dkt. No. 53.  The Court stayed discovery in this matter pending resolution of Defendants' partial motion to dismiss.  Dkt. No. 57.

5

### III. LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff must allege sufficient facts, when accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While a complaint need not present "detailed factual allegations," *Twombly*, 550 U.S. at 555, legal conclusions, unsupported by factual assertions, are insufficient. *Iqbal,* 556 U.S. at 679. In considering a motion to dismiss, the Court "may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010); *see also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

"An ERISA-regulated plan is construed in accordance with federal common law." *Gibbs ex rel. Estate of Gibbs v. CIGNA Corp.*, 440 F.3d 571, 578 (2d Cir. 2006). "ERISA federal common law is largely informed by state law principles," and courts "apply familiar rules of contract interpretation in reading an ERISA plan." *Lifson v. INA Life Ins. Co. of New York*, 333 F.3d 349, 352–53 (2d Cir. 2003) (per curiam). "[U]nambiguous language in an ERISA plan must be interpreted and enforced in accordance with its plain meaning. Language is ambiguous when it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." *Strom v. Siegel Fenchel & Peddy P.C. Profit Sharing Plan*, 497 F.3d 234, 244 n.6 (2d Cir. 2007) (internal quotation marks omitted) (quoting *Aramony v. United Way Replacement Benefit Plan*, 191 F.3d 140, 149 (2d Cir. 1999)). On the other hand, "contract language 'is unambiguous when it has a definite and precise meaning and where there is no reasonable basis for a difference of opinion.'" *Keane v. Zitomer Pharmacy, Inc.*, No. 06-cv-5981 (RJS) (KNF), 2010 WL 624285, at *4 (S.D.N.Y. Feb. 23, 2010) (quoting *Klos v. Lotnicze*, 133 F.3d 164, 168 (2d Cir. 1997)).

"Whether ERISA plan language is ambiguous is a question of law that is resolved by reference to the contract alone." *Strom*, 497 F.3d at 244 n.6 (internal quotation marks omitted) (quoting *O'Neil v. Ret. Plan for Salaried Employees of RKO Gen., Inc.*, 37 F.3d 55, 59 (2d Cir. 1994)). A motion to dismiss under Rule 12(b)(6) "can be granted only where the language of a contract is clear and unambiguous." *Readick v. Avis Budget Group, Inc.*, No. 12 Civ. 3988 (PGG), 2013 WL 3388225, at *4 (S.D.N.Y. July 3, 2013).

## IV.  ANALYSIS

### A.  The Parties' Arguments

Plaintiffs contend that the 2006 MOU obligates Defendants "to make payments on the licensing revenues generated by [foreign audio streams]"—which are generated through negotiated voluntary licenses, rather than statutory or compulsory licensing fees—"on the payment terms set out in the 1994 MOA." Am. Compl. ¶ 23. In support, Plaintiffs rely primarily on two provisions of the 2006 MOU Term Sheet. First, Plaintiffs note that "Audio Streams" is defined as "a phonograph record which is sold via digital transmission in the U.S. *and* abroad." 2006 MOU Term Sheet ¶ 1(g) (emphasis added). Second, Plaintiffs point to ¶ 1(k) of the 2006 MOU Term Sheet, which states in full:

> This Term Sheet shall cover terms for Downloads, Non-Permanent Downloads, and Video Streams and shall not cover terms for Audio Streams. Audio Streams that are subject to the compulsory license created by 17 U.S.C. Section 114 will be governed by the provisions of Section 114. Audio Streams that are made pursuant to interactive or other non-statutory licenses granted by the Company pursuant to Section 114, are covered by the 1994 MOA.

*Id.* ¶ 1(k).

Because the last sentence of ¶ 1(k) states that audio streams made pursuant to non-statutory licenses are "covered by" the 1994 MOA, Plaintiffs assert that the 2006 MOU imposes an ongoing obligation for Defendants to pay contributions for such audio streams under the same payment terms as the 1994 MOA. And because "Audio Streams" is defined to include digital transmissions

7

abroad, Plaintiffs contend that that ¶ 1(k) imposes an ongoing obligation for Defendants to pay contributions for foreign audio streams under the same payment terms as the 1994 MOA.[2]

Defendants argue that Plaintiffs' claim should be dismissed for two reasons. First, Defendants contend that the 2006 MOU cannot plausibly be read to impose *any* payment obligations for all audio streams. Instead, Defendants assert that the language relied on by Plaintiffs in ¶ 1(k)—that audio streams are "covered by" the 1994 MOA—is descriptive rather than prescriptive. Because any payment obligations described in the 1994 MOA otherwise expired, Defendants contend that Plaintiffs fail to plausibly allege that Defendants were under any continued contractual obligation to make payments for all audio streams.

Alternatively, Defendants argue that, even if the last sentence of ¶ 1(k) can plausibly be read as imposing a payment obligation with respect to audio streams, Plaintiffs fail to plausibly allege that such payment obligations extended to *foreign* audio streams. Although the term "Audio Streams" is defined in the 2006 MOU Term Sheet to include digital transmissions sold abroad, Defendants note that any payment obligation described in ¶ 1(k) applies to only Audio Streams "made pursuant to interactive or other non-statutory licenses granted by the Company *pursuant to* Section 114 [of the Copyright Act]," rather than *all* Audio Streams. 2006 MOU Term Sheet ¶ 1(k) (emphasis added). Defendants assert that because the Copyright Act does not apply extraterritorially—and thus Section

---

[2] In their opposition to the motion to dismiss and again at oral argument, Plaintiffs clarified their position, asserting that ¶ 1(k) of the 2006 MOU Term Sheet "did *not* create a 'new' payment obligation with respect to domestic *or* foreign streaming." Pls.' Opp'n Br. at 10 (emphasis in original), Dkt. No. 55. Rather, Plaintiffs argue that the 1994 MOA created a payment obligation with respect to both domestic and foreign streaming, and ¶ 1(k) of the 2006 MOU Term Sheet "carr[ied] that pre-existing payment obligation . . . forward into the future on the same payment terms already provided for in the 1994 MOA." *Id.* at 9–10 (emphasis removed). Whether ¶ 1(k) is characterized as a new payment obligation or carrying "forward into the future" a pre-existing payment obligation is immaterial. In either event, the alleged source of the payment obligation is the 2006 MOU. *See* November 12, 2015 Tr. at 9:4–5, Dkt. No. 62 (referring to the last sentence of ¶1(k) of the 2006 MOU Term Sheet and stating that "[i]f that sentence doesn't reestablish the payment obligation, there is no payment obligation"); *see also* July 26, 2016 Tr. at 10:3–7 (acknowledging that "the only basis for [Plaintiffs'] claim that payment obligations persist under the 1994 MOA [is] that the [2006 MOU Term Sheet] modif[ies] and extend[s] those terms").

114 creates only domestic rights—any licenses granted by Defendants in foreign countries are not made "pursuant to" Section 114.  Thus, Defendants contend that, if ¶ 1(k) imposes any payment obligation for revenue derived from non-statutory licenses for audio streams, that same language carves out payments for foreign audio streams, which are not licensed "pursuant to" U.S. Copyright laws.

### B.  The 2006 MOU is Unambiguous

The terms of the 2006 MOU are not susceptible to more than one interpretation, and cannot plausibly be read as a contractual source for payment obligations in respect of audio streams.  Plaintiffs' sole basis for alleging that the 2006 MOU imposes such payment obligations rests on a single sentence in ¶ 1(k) of the 2006 MOU Term Sheet—that "Audio Streams . . . are covered by the 1994 MOA."  But that single descriptive provision, when read in the context of the entire agreement, plainly does not prescribe future payment obligations.  The mere descriptive statement that audio streams are covered by a separate agreement does not, in and of itself, impose payment obligations or otherwise extend any payment obligations described in that separate agreement.

As a preliminary matter, the 2006 MOU purports to modify and extend payment obligations required to be paid pursuant to the SRLA—not payment obligations set forth in the 1994 MOA, which Plaintiffs concede is not part of the SRLA.[3]  First, the Preamble to the 2006 MOU states that the existing SRLA and its accompanying agreements, which are expressly listed, "shall be modified, changed or deleted as set forth below."  2006 MOU, Preamble ¶ 1.  The following paragraph then explains that, "[i]n all other respects[,] the provisions of the Agreements referred to in paragraph 1 shall remain in full force and effect during the term of the SRLA . . . ."  *Id.* ¶ 2.  Thus, the preamble

---

[3] The parties failed to provide the SRLA as an exhibit to the complaint or in the motion to dismiss briefing.  Nevertheless, Plaintiffs concede that "the 2002 SRLA has nothing to do with the 1994 MOA," and the parties' agree that the pre-existing SRLA was not integral to the complaint or otherwise necessary to interpret the 2006 MOU.  *See* July 26, 2016 Tr. at 12:13–18; 24:12–25:22.  Thus, the Court interprets the 2006 MOU, which purports to modify the existing SRLA, without the SRLA itself.

provides that the 2006 MOU modifies the SRLA and its accompanying agreements to the extent set forth in the 2006 MOU; to the extent that the 2006 MOU does not modify those agreements, those terms remain in effect.  Nothing in the preamble supports a reading of the 2006 MOU that would modify or otherwise extend payment obligations arising from the 1994 MOA; the 1994 MOA is not listed as an agreement being modified or extended pursuant to the 2006 MOU.

Section 11(b) of the 2006 MOU introduces the 2006 MOU Term Sheet.  That section of the 2006 MOU describes the scope of the agreements reached by the parties which were reflected in the 2006 MOU Term Sheet as follows:

> The parties agreed to specific terms regarding the digital exploitation of (1) phonograph records (as defined in [the 2006 MOU Term Sheet]) through Downloads or Non-Permanent Downloads, and (2) Traditional Music Videos (as defined in [the 2006 MOU Term Sheet] through Downloads, Non-Permanent Downloads and Video Streams . . . .  These specific terms are set forth in [the 2006 MOU Term Sheet], and shall be incorporated into the appropriate sections of the SRLA . . . .

2006 MOU ¶ 11(b).

Plaintiffs' argument that the 2006 MOU Term Sheet creates an obligation to make payments with respect to audio streams pursuant to terms set forth in the 1994 MOA is plainly contradicted by this text in two critical ways.  First, the scope of the agreements which are stated to be reflected in the 2006 MOU Term Sheet do *not* include agreements regarding audio streams.  Second, the 2006 MOU Term Sheet is described as defining modifications to the SLRA, *not* the 1994 MOA.  The absence of any reference in Section 11(b) of the 2006 MOU to an agreement regarding audio streams is wholly consistent with the text of the 2006 Term Sheet itself, which, as described below, expressly states—twice—that it does *not* cover the commercial exploitation of audio streams.

The 2006 MOU Term Sheet does not purport to affect any obligations with respect to audio streams.  To the contrary, it expressly disclaims coverage of audio streams.  Audio Streams are defined in the 2006 MOU Term Sheet as "a phonograph record which is sold via digital transmission . . . using streaming technology."  *Id.* ¶ (1)(g).  However, the only exploitation of

10

phonograph records that the 2006 MOU Term Sheet purports to cover is the digital exploitation of phonograph records "through Download or Non-Permanent Downloads," *id.* ¶ (1), rather than through audio streams. Indeed, the 2006 MOU Term Sheet plainly states that "[f]or the avoidance of doubt, nothing herein shall be construed as covering . . . the commercial digital exploitation of Audio Streams." *Id.* This language in the 2006 MOU Term Sheet expressly disclaiming any impact on the audio streams is clear and unambiguous.

In addition, ¶ 1(k) of the 2006 MOU Term Sheet—the last sentence of which is the basis of Plaintiffs' claim—itself begins with the following text: "This Term Sheet shall cover terms for Downloads, Non-Permanent Downloads, and Video Streams *and shall not cover terms for Audio Streams*." 2006 MOU Term Sheet ¶ 1(k) (emphasis added). The last sentence of ¶ 1(k) must be read in a manner consistent with the express exclusions of audio streams from coverage under the term sheet included in the introduction to the term sheet and in ¶ 1(k) itself. Because the digital exploitation of audio streams is expressly stated to be outside the scope of the 2006 MOU Term Sheet by the term sheet itself, the last sentence of ¶ 1(k) can only be reasonably construed as a description of where audio streams are in fact covered—either by statute, for audio streams subject to a compulsory license, or by the 1994 MOA, for audio streams made pursuant to non-statutory licenses, as the case may be. In either event, the 2006 MOU is not itself a source for such payment obligations. When read in the context of the entire agreement, the last sentence of ¶ 1(k) of the 2006 MOU Term Sheet unambiguously does not impose or extend payment obligations for audio streams.

In opposition, Plaintiffs primarily argue that, even if the Court accepts Defendants' proffered interpretation as a reasonable reading of the 2006 MOU, granting the motion to dismiss is inappropriate because ¶ 1(k) of the 2006 MOU Term Sheet is susceptible to more than one interpretation. Plaintiffs contend that the last sentence in ¶ 1(k) of the 2006 MOU Term Sheet,

which provides that "Audio Streams . . . are covered by the 1994 MOA," should be read as referring to *payment terms* for Audio Streams. Thus, Plaintiffs assert that, if the Court inserts the words "payment terms," such that ¶ 1(k) states that "*payment terms* for Audio Streams . . . are covered by the 1994 MOA," the 2006 MOU can reasonably be read to impose an ongoing payment obligation for revenue derived from Audio Streams, the terms of which are found in the 1994 MOA. Plaintiffs' argument fails for several reasons.

First, although Plaintiffs posit that additional terms would render their proffered interpretation reasonable, "a court must not rewrite, under the guise of interpretation, a term of the contract when the term is clear and unambiguous." *Burke v. PriceWaterHouseCoopers LLP Term Disability Plan*, 572 F.3d 76, 81 (2d Cir. 2009) (internal quotation marks and citation omitted); *see also Law Debenture Trust Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458, 468 (2d Cir. 2010) ("[T]he courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing.") (internal quotation marks and citation omitted). For the reasons discussed above, the Court has found that the agreement on this point is clear and unambiguous. The Court declines to add additional terms to the parties' agreement under the guise of contract interpretation. The Court construes the agreement as written in fact, not as Plaintiffs would rewrite it in their argument.

Moreover, Plaintiffs' proffered interpretation would render other language in the contract meaningless. Paragraph 1(l) of the 2006 MOU Term Sheet, which applies to ringbacks, states that "Ringbacks shall be covered by, *and payments shall be made pursuant to*, either this agreement or the 1994 MOA (as may be amended)." 2006 MOU Term Sheet ¶ 1(l) (emphasis added). If simply stating that audio streams or ringbacks "are covered by" a contract was sufficient to impose future payment obligations under that contract, as asserted by Plaintiffs, then there would be no need to state that "payments shall be made pursuant to" the 1994 MOA or the 2006 MOU in ¶ 1(l). Thus,

Plaintiffs' proffered interpretation of ¶ 1(k) would render the clause "payments shall be made pursuant to" in ¶ 1(l) superfluous. But it is "basic contract law" that "an interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless is not preferred and will be avoided if possible." *Unique Woodworking, Inc. v. New York City Dist. Council of Carpenters' Pension Fund*, No. 07-cv-1951 (WCC), 2007 WL 4267632, at *6 (S.D.N.Y. Nov. 30, 2007) (brackets and ellipses omitted) (quoting *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005)). Because an alternative reading of ¶ 1(k) would avoid rendering the language in ¶ 1(l) redundant, it is not necessary to accept Plaintiff's strained interpretation of the 2006 MOU.

In any event, even if the Court were to accept that the last sentence of ¶ 1(k) of the 2006 MOU Term Sheet should be read to refer to "payment terms" for audio streams, the 2006 MOU nevertheless cannot be read as imposing payments obligations for revenues derived from audio streams. The Court must read that single sentence in the context of the entire agreement. Remember, among other things: (1) the 2006 MOU states that it modifies the SLRA, not the 1994 MOA; (2) the 2006 MOU does *not* say that the 2006 Term Sheet reflects agreements regarding audio streams; (3) the 2006 MOU Term Sheet expressly cautions that "nothing herein shall be construed as covering the . . . commercial digital exploitation of Audio Streams;" and (4) ¶ 1(k) of the term sheet itself begins with the statement that the term sheet does "not cover terms for Audio Streams." In that context, the isolated, descriptive statement in the last sentence of ¶ 1(k) that "payment terms for Audio Streams . . . are covered by the 1994 MOA" cannot be viewed to impose an ongoing contractual obligation to make payments in respect of audio streams under the 2006 MOA or otherwise extend payment obligations with respect to audio streams contained in the 1994 MOA.

Plaintiffs advance several other arguments as to why the 2006 MOU should be read as imposing payment obligations with respect to audio streams, despite unambiguous language to the contrary. First, Plaintiffs argue that Defendants' proffered interpretation of the 2006 MOU would

13

render the final sentence of ¶ 1(k) of the 2006 MOU Term Sheet "a nullity." *See* July 26, 2016 Hearing Tr. at 19:4–12. Not so. As noted above, the 2006 MOU Term Sheet cautions that "nothing herein shall be construed as covering . . . the commercial digital exploitation of Audio Streams." MOU Term Sheet ¶ 1. With that exclusion from the coverage of the term sheet established, ¶ 1(k) serves the purpose of describing what does cover audio streams—namely, in this instance, the 1994 MOA.

Next, Plaintiffs point to several pieces of extrinsic evidence in support of their proffered reading of the 2006 MOU, including: (1) an unexecuted January 2006 Record Company proposal that "did not become the final agreement between the parties," Am. Compl. ¶ 23; January 2006 Proposal, Dkt. No. 44-2; and (2) a portion of an agreement entered into between the record companies and AFTRA, a separate union, Am. Compl. ¶ 24; AFTRA Agreement, Dkt. No. 44-4. However, "[i]n making a determination of ambiguity, reference may not be had to matters external to the entire integrated agreement." *Aramony v. United Way of America*, 254 F.3d 403, 412 (2d Cir. 2001) (internal quotation marks and citation omitted). Thus, the Court may not consider such extrinsic evidence when interpreting the unambiguous terms of the 2006 MOU.

Relatedly, Plaintiffs allege that Defendants have in fact made contributions based on revenue derived from voluntary licenses for domestic audio streams, after the stated expiration of the 1994 MOA. Pls.' Opp'n at 17 n.9 ("[T]he very reason that Count I of the [complaint] is limited to a claim for payments . . . on *foreign* streaming is that the companies have acknowledged their contractual payment obligation with respect to *domestic* streaming and have been making payments to the Pension Fund on *domestic* streaming since the 1994 [MOA] was modified in 2012 . . . .") (emphasis in original). Because those payments would not otherwise be owed, Plaintiffs contend that the 2006 MOU must be read to impose some payment obligation with respect to audio streams. However, as already described, the Court finds that the 2006 MOU is unambiguous as a matter of law. Thus,

Plaintiffs may not rely on extrinsic evidence, such as the parties' course of performance, to contradict the plain terms of the agreement. *See Am. Fed'n of Grain Millers, AFL-CIO v. Int'l Multifoods Corp.*, 116 F.3d 976, 981 (2d Cir. 1997) (finding that the employer "had no obligation to provide [benefits] to its retirees after the [collective bargaining agreements] expired," despite extrinsic evidence that the employer in fact provided benefits after the agreements expired, because "extrinsic evidence cannot alter the meaning of unambiguous terms").

Because the Court finds that the 2006 MOU does not itself impose any payment obligations with respect to any audio streams, or otherwise extend such obligations under the 1994 MOA, the Court need not address Defendants' alternative argument that the 2006 MOU imposes payment obligations with respect to domestic audio streams alone.

For the reasons described above, Defendants' motion to dismiss Count One of the amended complaint is GRANTED. The dismissal is without leave to replead the claim based on the 2006 MOU imposing payment obligations with respect to audio streams or otherwise extending such obligations under the 1994 MOA, because any attempt to replead on that basis would be futile. *See Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, 106 F.3d 11, 18 (2d Cir. 1997) (explaining that leave to amend need not be granted where the proposed amendment would be futile); *see also Arag-A Ltd. v. Republic of Argentina*, No. 16-cv-2238 (TPG), 2016 WL 1451586, at *9 (S.D.N.Y. Apr. 12, 2016) ("[W]here an unambiguous document requires dismissal in a contract case, further amendment will often be futile.").

### C. Standing

After briefing was completed on the motion to dismiss, the Court *sua sponte* raised the issue of whether Plaintiffs had standing to enforce any obligations under the 2006 MOU. *See* Dkt. No. 58. Specifically, the Court observed that the 2012 Agreement to Modify the 1994 MOA, on which Plaintiffs relied for standing, by its terms applies to payments due under the 1994 MOA alone.

Thus, the 2012 Agreement does not appear to give Plaintiffs standing to enforce payment obligations allegedly imposed by the 2006 MOU.

Because the parties failed to brief the issue, and the Court finds that the 2006 MOU is not a source for payment obligations for audio streams, the Court need not reach the issue of standing. *See Stevens ex rel. E.L. v. New York City Dep't of Educ.*, No. 09 Civ. 5327(DLC), 2010 WL 1005165, at *3 n. 2 (S.D.N.Y. Mar. 18, 2010) (declining to resolve question of standing where the issue was not briefed by either party and the court found that the plaintiff was not otherwise entitled to relief).

## V.     CONCLUSION

For the reasons outlined above, Defendants' partial motion to dismiss is GRANTED.

The temporary stay of discovery entered by the Court pending resolution of the motion to dismiss, Dkt. No. 57, has by its terms expired with the Court's resolution of the motion to dismiss. Accordingly, the temporary stay of discovery is lifted. The parties are directed to submit a revised Proposed Case Management Plan and Scheduling Order no later than seven days from the date of this order.

The Clerk of Court is directed to terminate the motion pending at Dkt. No. 53.

SO ORDERED.

Dated:  August 23, 2016
New York, New York

_____
GREGORY H. WOODS
United States District Judge